OMEGA CHEMICAL COMPANY, INC., APPELLEE AND CROSS-APPELLANT, V. UNITED SEEDS, INC., AND NEBRASKA SEED COMPANY, APPELLANTS AND CROSS-APPELLEES.

560 N.W.2d 820

Filed March 28, 1997.   No. S-94-822.

Eugene P. Welch and Francie C. Riedmann, of Gross & Welch, P.C., for appellant United Seeds.

Duane M. Katz for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.

Appellee Omega Chemical Company, Inc. (Omega), in its amended petition in equity, complains that appellants United Seeds, Inc., and Nebraska Seed Company (both hereinafter United Seeds), constructed a large grain bin on its own property in such close proximity to Omega's already existing structure that it constituted a nuisance. Omega prayed for the removal of

the grain bin and an award of general damages. Following a 5-day bench trial, the district court agreed with Omega and ordered United Seeds to completely remove its grain bin and assessed damages against United Seeds in the sum of $13,000. For the reasons that follow, we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

Omega and United Seeds own and operate businesses on separate properties which share a common boundary. A metal building on a block foundation was located on Omega's property at all times relevant to the instant case. Omega's building sits parallel to and slightly over the common property line between these corporate neighbors.

At one time, two Quonset huts sat on United Seeds' property directly adjacent to the Omega building. In the fall of 1986, United Seeds decided to remove the Quonset huts and prepare the site for construction of a large grain bin. United Seeds hired an excavation contractor to remove the Quonset huts, level and prepare the site for construction, and dig the footing and foundation for the grain bin. In addition, United Seeds hired a soil testing laboratory to conduct a subsurface investigation and determine whether the soil structure was sufficient to support the load of a large grain bin. Pursuant to the testing laboratory's report, soil was removed from under the foundation excavation for the grain bin and replaced with soil capable of bearing the projected load.

United Seeds obtained the requisite building permits from the city of Ralston; however, it is unclear from the record what, if any, plans city officials reviewed prior to issuing the permits. The decision concerning precisely where to locate the grain bin on United Seeds' property was made by United Seeds' president, Richard Berry, and vice president, John Jones. The location ultimately selected caused the grain bin to be constructed less than 4 feet from the east wall of Omega's already existing building.

United Seeds hired a structural engineer, Eldon Schroder, to design the footing and foundation for the grain bin. Schroder was experienced in foundation design for grain bins. The record indicates that United Seeds did not supply Schroder with suffi-

cient information concerning the site so as to allow Schroder to account for all relevant design considerations. Specifically, Schroder was unaware that Omega's building was located either on the property line or slightly encroaching onto United Seeds' property. However, Schroder was aware that United Seeds wanted the grain bin located as close as possible to its common property line with Omega. Schroder's foundation design included a footing flange that extended 4 feet beyond the circumference of the foundation which directly supported the grain bin. Thus, the closest Schroder could place the grain bin to the property line was 4 feet.

United Seeds hired Dale Wall of Wall Construction to construct the grain bin. Wall stated that placement of the grain bin was the decision of either Berry or Jones. Wall acknowledged that the foundation excavation directly supporting the grain bin was less than 4 feet from Omega's building; thus, the footing flange in the area of Omega's building was less than 4 feet wide, as required by the design specifications. Wall testified that the footing or wall of Omega's building and the grain bin footing flange were only 1½ inches apart.

Construction of the grain bin was completed in December 1986. Berry testified that United Seeds began using the bin immediately upon completion. It took 6 weeks to fill the grain bin to capacity, and it remained full for the next 18 months. United Seeds emptied the bin in 1988 and has not used it since then for grain storage.

Omega's president, Alan Doub, testified that from 1985 until 1988, Omega leased its building adjacent to United Seeds to other businesses. It was not until Omega took over occupancy of the building, nearly 3 years after the construction of the grain bin, that Doub became concerned about the appearance of cracks in the east wall and basement floor of his building. In addition, Doub testified that he had no knowledge of United Seeds' plan to erect a grain bin until after the grain bin was constructed. Doub admitted that his building was in poor repair notwithstanding any damage allegedly caused by the grain bin.

The testimony of each party's expert witnesses was a focal point of the trial and will be discussed in conjunction with our analysis.

## II. FINDINGS OF DISTRICT COURT

In its findings of fact and conclusions of law, the trial court found that United Seeds had constructed its grain bin in such close proximity to Omega's building that the grain bin's foundation was within inches of Omega's building's foundation.

The court determined that both Berry and Jones knew United Seeds' grain bin was to be constructed in close proximity to Omega's building and found United Seeds to be "negligent in allowing and/or authorizing the construction of the subject grain bin." The court further determined that the grain bin presented a fire or explosion hazard constituting an unreasonable risk to Omega.

The court issued its findings in letter form and provided United Seeds a choice of remedies. It could either pay $84,763 in damages and not remove its grain bin, or remove the grain bin and pay $13,000 in damages. When United Seeds failed to elect a remedy, the court granted the injunctive relief prayed for and ordered United Seeds to completely remove the grain bin, as well as to pay Omega $13,000 in damages plus court costs.

## III. SCOPE OF REVIEW

An action for injunction sounds in equity. *Sid Dillon Chevrolet v. Sullivan*, 251 Neb. 722, 559 N.W.2d 740 (1997); *Latenser v. Intercessors of the Lamb, Inc.*, 250 Neb. 789, 553 N.W.2d 458 (1996). In an appeal from an equitable action, the reviewing court reviews the action de novo on the record and reaches a conclusion independent of the factual findings of the lower court, subject to the rule that where credible evidence is in conflict on material issues of fact, the reviewing court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Sid Dillon Chevrolet v. Sullivan, supra*; *Engelhaupt v. Village of Butte*, 248 Neb. 827, 539 N.W.2d 430 (1995).

## IV. ASSIGNMENTS OF ERROR

Restated and summarized, United Seeds asserts that the district court erred in finding it was liable for the creation or continuance of a nuisance by (1) allowing evidence of building codes other than the particular code in effect at the time of construction, (2) finding that the construction of a grain bin placed

Omega's building in a hazard zone, and (3) finding that grain storage presents an unreasonable risk of fire or explosion to Omega. In addition, United Seeds contends that the district court erred by granting Omega injunctive relief and in its application of the measure of damages.

Omega cross-appeals the trial court's order in which United Seeds was provided the choice of two remedies before judgment was entered.

## V. ANALYSIS

United Seeds first asserts that the building code in effect for the city of Ralston at all pertinent times was the 1967 National Building Code and that the trial court erred in admitting other building codes in evidence. Over United Seeds' hearsay objection, the trial court received in evidence a certified copy of a Ralston city ordinance adopting the 1967 National Building Code together with attached copies of the relevant portions of the 1967 code, as well as uncertified copies of portions of the 1976 and 1985 National Building Codes. There is no question that the uncertified copies of the 1976 and 1985 building codes were offered for their truth; that being, the codes are the standard of due care for contractors and engineers. As such, the texts of these codes are hearsay, and it was error for the trial court to admit the texts of the codes in evidence.

However, the trial court stated in its findings that it was the opinions of the experts that it relied on in its factual determinations, not an independent examination of the codes. Neb. Rev. Stat. § 27-703 (Reissue 1995) provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Omega's two engineering experts testified that in forming their respective opinions, they relied on the 1976 and 1985 building codes, as well as the 1967 code adopted by the city of Ralston. One of the engineers explained that a building code

adopted by a particular municipality represents a minimum requirement and that good engineering practices require consideration of any uniform codes promulgated thereafter. Further, both experts testified that the 1976 and 1985 building codes are model building codes that are routinely relied upon by engineers in forming opinions on structural issues in the field.

Thus, even though we determine that the trial court erred in admitting copies of the 1976 and 1985 building codes in evidence, we are mindful of the presumption that in an equity case, the trial court will disregard inadmissible evidence in resolving a factual issue or question. See *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976). The trial court did not make a factual determination or resolve a factual issue by utilizing or relying upon either the 1976 or 1985 building code. Erroneous admission of evidence in a bench trial in an equity case does not require reversal where other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's necessary factual findings. See *Barber v. Barber*, 207 Neb. 101, 296 N.W.2d 463 (1980). The admission of the text of the 1976 and 1985 building codes did not constitute reversible error in the instant case.

### 1. EXISTENCE OF NUISANCE

Omega's amended petition states a cause of action in equity. With respect to an action in equity, a legitimate business enterprise is not a nuisance per se, but it may become a nuisance in fact by reason of the conditions implicit in and unavoidably resulting from its operation or because of the manner of its operation. *Hall v. Phillips*, 231 Neb. 269, 436 N.W.2d 139 (1989); *City of Syracuse v. Farmers Elevator, Inc.*, 182 Neb. 783, 157 N.W.2d 394 (1968). Furthermore, with respect to a nuisance in the context of an action in equity, the invasion of or interference with another's private use and enjoyment of land need only be substantial. *Goeke v. National Farms, Inc.*, 245 Neb. 262, 512 N.W.2d 626 (1994); *Hall v. Phillips, supra.*

Omega identified three conditions which it asserts unavoidably resulted from or existed because of the manner of United Seeds' operation, and caused a substantial invasion or interference with the use of Omega's property. Those conditions are

that United Seeds' grain bin presents an unreasonable risk of (1) further damage to the foundation, basement floor, and east wall of its building due to footing encroachment; (2) damage to its building's roof structure from increased snow load; and (3) fire or explosion.

### (a) Footing Encroachment

Our de novo review of the record convinces us that construction of the grain bin so close to Omega's building caused specific, identifiable, and continuing injury to the building's foundation, basement floor, and east wall. In this regard, the testimony of Omega's engineering expert, James Hossak, was particularly convincing.

Hossak described the cause of the circular cracking found on the basement floor of Omega's building next to the east wall and the vertical cracks running through the middle of the concrete blocks of the east wall immediately adjacent to the grain bin. A drawing prepared by Hossak demonstrated that the circular cracks in the basement floor paralleled the circumference of the grain bin and that the vertical cracks through the concrete block in the east wall all appear directly adjacent to the closest point between the Omega building and the grain bin's footing flange.

Hossak testified that the phenomenon which caused the circular cracking in the floor is explained by the transfer of the load from the footing of the grain bin to the footing of Omega's building. Hossak further testified that by driving rods into the ground, he determined the relative footing depths of the two structures. He found that the bottom of the footing for the grain bin was 10 inches above the top of the footing for Omega's building and that the two footings were separated by a horizontal distance of 1½ to 2 inches. Because of this spatial relationship, 80 percent of the load of the grain bin was being transferred to the footing of Omega's building and to the soil below this footing. Hossak testified that this caused settlement in Omega's building and stress to the wall of the building. Hossak also opined that this condition will further deteriorate if the grain bin is used again.

United Seeds attempted to refute Hossak's claim in cross-examination when it suggested that Omega's building was in

poor repair prior to the construction of the grain bin and that the damage alleged to have been caused by the grain bin is no different from the damage attributable to other causes. In addition, United Seeds, through testimony of Jones, disputed Hossak's claim that the grain bin footing was at a higher elevation in relation to the building's footing.

However, United Seeds' claims do not comport with the evidence. The damage alleged to be specifically caused by the grain bin is the circular cracking in the basement floor and the vertical cracks through the middle of the concrete blocks in the east wall. The evidence clearly demonstrates that such damage appears only in proximity to the grain bin. The other nonspecific damage that United Seeds points to consists of horizontal and vertical cracks through the mortar joints of other walls, not through the concrete block in those walls. The expert testimony revealed that damage to mortar joints can be attributed to shrinkage or other factors. However, vertical cracks through the concrete block on the east wall were attributed solely to the stress of the grain bin.

United Seeds also offers as a defense evidence of due care in the design and construction of its grain bin. However, it is well settled that the exercise of due care is not a defense to a claim based on nuisance. *Hall v. Phillips*, 231 Neb. 269, 436 N.W.2d 139 (1989). Furthermore, the evidence presented does not support United Seeds' contention that it exercised due care.

United Seeds failed to inform the engineer it hired to design the grain bin's foundation, Schroder, that it intended to locate the structure within 4 feet of an already existing building. Thus, Schroder was unable to design a foundation which would minimize an encroachment onto the footing of Omega's building.

Accordingly, we conclude that the encroachment onto the footing of Omega's building by United Seeds' grain bin, resulting in damage to the footing, basement floor, and east wall of the building, was a substantial and ongoing invasion of the private use of Omega's building and thus constitutes a nuisance.

### (b) Snow-load Effect

Hossak also testified in regard to the snow-loading effect of United Seeds' grain bin on Omega's building. Hossak testified that whenever a smaller building is designed to stand in close

proximity to a taller structure, proper engineering practice requires that consideration be given to the snowdrift effect the taller building will have on the shorter building. To this extent, the shorter building's roof must be designed to accommodate a heavier snow load.

Hossak testified that various building codes contain formulas used by engineers to calculate the minimum necessary structural requirements for differential roof heights of separated buildings to accommodate snow-load effects. Specifically, Hossak stated that, based on the building codes, prior to the construction of the grain bin, the snow-load requirement for the Omega building's roof structure was between 20 and 25 pounds per square foot. With the grain bin in place, the snow-load requirement is now between 80 and 90 pounds per square foot. Hossak opined that in time and under the right conditions, the grain bin could cause snow to accumulate on Omega's building and collapse its roof.

United Seeds attempted to discredit Hossak's testimony by positing that only winter snowstorms driven by an east wind could cause a snow-load effect on Omega's building situated directly west of United Seeds' grain bin and that the climatological data received in evidence indicates that a snowstorm which occurred on March 13, 1991, was driven primarily by northwest winds.

However, contrary to United Seeds' claim, close examination of the climatological data indicates that the March 13, 1991, snowstorm was at times driven by winds 10 degrees to the east of north. Further, photographs received in evidence clearly demonstrate that after the March 13 snowstorm, a disproportionate amount of snow had been deposited on that portion of Omega's building situated directly southwest of the grain bin. Thus, the evidence does not support United Seeds' claim that only winter snowstorms driven by an east wind could cause a significant snow-load effect on Omega's building. The data support Hossak's opinion that the proximity of the grain bin creates a viable danger that during certain winter storms, additional snow may be loaded onto Omega's building.

Omega's claim in regard to the snow-load effect is one of an anticipatory nuisance. In *City of Syracuse v. Farmers Elevator,*

*Inc.*, 182 Neb. 783, 157 N.W.2d 394 (1968), the defendant constructed an anhydrous ammonia fertilizer distribution facility within the 400-foot minimum setback required by the Agricultural Ammonia Institute from already existing places of public assembly. We held that the defendant's actions constituted an anticipatory nuisance.

As in *City of Syracuse v. Farmers Elevator, Inc., supra*, we determine that United Seeds' actions constitute an anticipatory nuisance. United Seeds chose to locate its grain bin so close to Omega's already existing building that, according to the standards utilized by engineers in the profession, the structural integrity of Omega's building was necessarily compromised. Accordingly, we find that by reason of the conditions implicit in and unavoidably resulting from its operation, United Seeds' grain bin effects a substantial invasion in the private use of Omega's building by placing its roof structure at risk of collapse due to an increased snow-load potential.

### (c) Risk of Fire or Explosion

Finally, Omega claims that United Seeds' grain bin places Omega's building in a hazard zone or creates an unreasonable risk of fire or explosion. The record does not support such a contention. In support of its claim, Omega called another engineering expert, Thomas Lang, who testified that corn was a combustible material and that explosions have been known to occur in grain storage facilities.

However, on cross-examination, Lang admitted that corn, although combustible, is not highly combustible or explosive. In addition, Lang admitted that the building codes generally categorized uses as "high hazard" when such uses involve materials such as aluminum powder, cellulose nitrate, alcohol, petroleum distillates, and gasoline. Only those occupancies which process or handle grain or wood so as to generate dust were identified by the codes as high hazards. In that regard, Lang testified that the distinction between a grain elevator and a grain bin is that a grain bin is used for storage of grain and an elevator for the transfer of grain. The significant distinction is that an elevator's grain handling machinery is internal to its operation, whereas a bin's machinery is external.

Sanford Goshorn, a grain elevator inspector for the Nebraska State Fire Marshal, testified on behalf of United Seeds. Goshorn testified that United Seeds' grain bin did not present a fire or explosion hazard. Goshorn recognized the same distinctions between a grain elevator and a grain bin as did Lang. However, Goshorn stated that the risk of ignition is much greater in a grain elevator than in a grain bin because, unlike a grain bin, elevators generate a large amount of grain dust, and the mechanical contrivances of an elevator are internal to its structure, thus increasing the chance of a spark source for ignition.

We are persuaded by Goshorn's testimony and conclude that the district court erred in determining that United Seeds' grain bin created a hazard zone with respect to fire and explosion which endangered Omega's building.

## 2. INJUNCTIVE RELIEF

An injunction is an extraordinary remedy and ordinarily should not be granted except in a clear case where there is actual and substantial injury. Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Ben Simon's, Inc. v. Lincoln Joint-Venture*, 248 Neb. 465, 535 N.W.2d 712 (1995); *Nebraska Irrigation, Inc. v. Koch*, 246 Neb. 856, 523 N.W.2d 676 (1994).

We conclude that the district court properly issued injunctive relief to Omega in this matter. The record establishes that Omega's building will continue to suffer an actual and substantial injury to its foundation due to the footing encroachment and increased snow-load potential to its roof structure resulting from a nontrespassory invasion of its property by United Seeds. As such, Omega's right to relief is clear.

Omega's remedy at law is inadequate to prevent a failure of justice. The evidence suggests that, should both structures remain in their present locations, Omega's building will continue to suffer damage due to footing encroachment. Obviously, one structure must be relocated. Accordingly, an award of damages alone is insufficient to prevent a failure of justice in the instant case.

Furthermore, the damage to Omega's building is irreparable without the benefit of equitable relief. This is so because if the

grain bin is not removed, it will continue to damage Omega's building. In addition, the trial testimony revealed that the cost of making structural improvements to Omega's existing building, so that both structures may remain in place, exceeds the cost of relocating and rebuilding a like structure.

### 3. MEASURE OF DAMAGES

Where an improvement upon realty is damaged without damage to the realty itself and where the nature of the thing damaged is such that it is capable of being repaired or restored and the cost of doing so is capable of reasonable ascertainment, the measure of damages for its negligent damage is the reasonable cost of repairing or restoring the property in like kind and quality. *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 322 N.W.2d 651 (1982).

Lang testified that the cost of repairs to Omega's building, assuming the removal of the grain bin, was $13,000. Additionally, Lang testified that he and Hossak designed modifications to Omega's building which would allow the structure to withstand the snow-load and footing encroachment effects should the grain bin remain in place. Lang stated that the cost of constructing these modifications would be $89,700. Finally, Lang estimated that the cost to construct a building with a similar number of square feet at a safe distance from United Seeds' grain bin would be $84,763.

In fashioning a remedy, we are mindful that Omega's building can be modified to accommodate the effects of the grain bin. However, this alternative is not equitable, since the foregoing testimony suggests that this choice would be the most expensive alternative. Second, Omega's building could be removed and relocated. This alternative also is not equitable, since it effects a private taking of Omega's property by the wrongdoer, United Seeds.

Thus, the district court chose the most equitable means through which Omega's property could be restored and repaired when it ordered United Seeds to completely remove its grain bin and pay Omega the cost of repairs to the basement floor and east wall of its building, i.e., $13,000. Having balanced the equities involved in this matter, and having determined that the

trial court did not err in granting the relief that it did, we need not address Omega's cross-appeal concerning the propriety of the trial court's invitation to United Seeds to choose between two remedies.

## VI. CONCLUSION

For all of the foregoing reasons, after reviewing this cause de novo on the record, we affirm the judgment of the district court.

AFFIRMED.

WHITE, C.J., and FAHRNBRUCH, J., concur in the result.